IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-97

No. 451A20

Filed 27 August 2021

IN THE MATTER OF: J.L.F.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from order entered on 23 July 2020 by Judge Ellen M. Shelley in District Court, McDowell County. This matter was calendared in the Supreme Court on 21 June 2021, but was determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Aaron G. Walker for petitioner-appellee McDowell County Department of Social Services.*

*Daniel Heyman for appellee Guardian ad Litem.*

*Leslie Rawls for respondent-appellant father.*

PER CURIAM.

Respondent-father William F. appeals from the trial court's order terminating his parental rights in his minor child J.L.F.[1] Respondent-father's appellate counsel has filed a no-merit brief on his client's behalf pursuant to N.C.R. App. P. 3.1(e). After careful consideration of the record in light of the applicable law, we conclude that the

---

[1] J.F.L will be referred to throughout the remainder of this opinion as "Jacob," which is a pseudonym that will be used for ease of reading and to protect the identity of the juvenile.

issues identified by respondent-father's appellate counsel as potentially supporting an award of relief from the trial court's termination order lack merit and affirm the trial court's order.

On 17 September 2018, the McDowell County Department of Social Services filed a petition alleging that Jacob was a neglected and dependent juvenile and obtained the entry of an order taking Jacob into nonsecure custody.[2] In its petition, DSS alleged that, while Jacob remained in the neo-natal intensive care unit following his birth, it had received a child protective services report on 6 August 2018 that expressed concerns relating to substance abuse, domestic violence, and the existence of an injurious environment. According to the child protective services report, the mother, Heather D., was afraid of respondent-father, who was reputed to be Jacob's father even though he had not been mentioned on Jacob's birth certificate,[3] and had obtained the entry of a restraining order, which she later "dropped," against respondent-father for the purpose of preventing him from learning of her current location and the fact of Jacob's birth. In addition, the child protective services report asserted that both the mother and respondent-father used methamphetamine.

---

[2] An amended juvenile petition and nonsecure custody order in which the juvenile's last name was corrected were, respectively, filed and entered on 28 September 2018.

[3] On 30 October 2018, respondent-father submitted to a paternity test, the results of which concluded that there was a 99.99% probability that he was Jacob's father.

DSS further alleged that, after the receipt of the child protective services report, the mother and respondent-father had met with agency representatives on 8 August 2018. At that time, the mother and respondent-father denied having used methamphetamine, acknowledged that they did not have an appropriate place to live, and agreed to comply with the terms of a safety plan that required them to obtain comprehensive clinical assessments and refrain from using illegal substances.

In addition, DSS alleged in the juvenile petition that Jacob had been discharged from the hospital into the care of his paternal grandparents on 11 August 2018. Subsequently, however, DSS determined that Jacob would not be safe in this placement after the grandmother reported that the grandfather "had taken off with [Jacob] without a car seat" and indicated that she could no longer care for Jacob given her concerns about the grandfather's temper and her fears for her own safety and that of Jacob. Moreover, DSS alleged that, even though they had been allowed to visit with Jacob while he was in his grandparents' care, the mother and respondent-father had only visited Jacob on a single occasion for approximately one hour during that period of time. Finally, DSS alleged that neither the mother nor respondent-father had attempted to contact DSS since the 8 August 2018 meeting; that its attempts to contact the mother and respondent-father had been unsuccessful; and that the mother and respondent-father were understood to be living in their vehicle, with their exact whereabouts being unknown.

After a hearing held on 29 November 2018, Judge C. Randy Pool entered an order on 7 December 2018 determining that Jacob was a neglected and dependent juvenile, placing Jacob in DSS custody, allowing the mother and respondent-father to have separate supervised visitation sessions with Jacob, and ordering the mother and respondent-father to comply with their case plans. In his case plan, respondent-father was required to obtain a comprehensive clinical assessment and comply with any resulting recommendations; complete intensive outpatient substance abuse treatment, abstain from the use of illegal substances, and submit to random drug screens; complete the Batterer's Intervention Program and refrain from "abus[ing], manipulat[ing], control[ling], or exert[ing] power over the [mother]"; complete parenting classes; participate in visitation; and obtain and maintain stable, safe, and independent housing and stable employment.

The underlying juvenile proceeding came on for an initial review and permanency planning hearing on 14 February 2019, by which time respondent-father had been sentenced to five consecutive terms of six to seventeen months imprisonment for violating the terms and conditions set out in earlier probationary judgments. In an order entered on 22 April 2019, Judge Pool found that the mother had been making progress toward satisfying the requirements of her case plan while respondent had been incarcerated. Judge Pool established a primary permanent plan of reunification and a secondary plan of custody or guardianship.

¶ 7 After another permanency planning hearing held on 16 May 2019, Judge Pool entered an order on 31 May 2019 maintaining the primary permanent plan of reunification in light of the fact that the mother continued to make progress toward satisfying the requirements of her case plan. After another permanency planning hearing held on 29 August 2019 hearing, however, Judge Robert K. Martelle entered an order changing the primary plan for Jacob to one of adoption, with a secondary plan of reunification, based upon determinations that the mother had entered into a new romantic relationship and was living with a man who had failed to comply with his own DSS case plan and that she intended to remain in that relationship after being informed that her persistence in such conduct created an obstacle to her reunification with Jacob. Although respondent-father remained incarcerated, he had been present for each of these permanency planning hearings while displaying little interest in Jacob and appearing to be focused upon the mother's alleged involvement with other men. At the time of the final permanency planning hearing, which was held before Judge Martelle on 21 November 2019, respondent-father asked to be allowed to leave the courtroom, was granted permission to do so, and threatened the mother while departing from that location.

¶ 8 On 27 November 2019, the mother executed a relinquishment of her parental rights in order to allow Jacob to be adopted by his foster mother, with whom Jacob had been placed since the date upon which he had been taken into DSS custody. On

4 March 2020, DSS filed a motion seeking to have respondent-father's parental rights in Jacob terminated on the basis of neglect, N.C.G.S. § 7B-1111(a)(1); willful failure to make reasonable progress toward correcting the conditions that had led to Jacob's removal from the family home, N.C.G.S. § 7B-1111(a)(2); failure to legitimate Jacob, N.C.G.S. § 7B-1111(a)(2)(5); dependency, N.C.G.S. § 7B-1111(a)6); and willful abandonment, N.C.G.S. § 7B-1111(a)(7) (2019). After a termination hearing held on 9 July 2020, the trial court entered an order on 23 July 2020 in which it established respondent-father's paternity and terminated respondent-father's parental rights in Jacob. More specifically, the trial court determined that respondent-father was Jacob's biological father, that respondent's-father's parental rights in Jacob were subject to termination on the basis of each of the grounds for termination alleged in the termination motion, and that the termination of respondent-father's parental rights would be in Jacob's best interests. Respondent-father noted an appeal to this Court from the trial court's termination order.[4]

---

[4] The record on appeal as settled by the parties reflects that respondent-father did not sign the notice of appeal that was filed on his behalf in this case as required by N.C.G.S. § 7B-1001(c) (2019) and N.C.R. App. P. 3.1(b). On the other hand, however, respondent-father's trial counsel did attach a letter that he had received from respondent-father, who remained in the custody of the Division of Adult Correction, in which respondent-father indicated that he wished to note an appeal from the trial court's termination order. Although a parent's failure to sign the relevant notice of appeal has been held to constitute a jurisdictional defect, *see In re L.B.*, 187 N.C. App. 326, 332 (2007), *aff'd per curiam*, 362 N.C. 507 (2008), we conclude that the decision by respondent-father's trial counsel to attach respondent-father's letter to the notice of appeal resulted in substantial compliance with the signature requirement delineated in N.C.G.S. § 7B-1001(c) and N.C.R. App. P. 3.1(b), particularly given

As we have already noted, respondent-father's appellate counsel has filed a no-merit brief on his client's behalf as authorized by N.C. R. App. P. Rule 3.1(e). In her no-merit brief, respondent-father's appellate counsel identified certain issues relating to the adjudication and dispositional portions of the termination proceeding that could potentially support an award of appellate relief, including whether the trial court had lawfully found that respondent-father's parental rights in Jacob were subject to termination and whether the trial court had abused its discretion by determining that termination of respondent-father's parental rights would be in Jacob's best interests before explaining why these potential issues lacked merit. In addition, respondent-father's appellate counsel advised respondent-father of his right to file pro se written arguments on his own behalf and provided him with the documents necessary to do so. Respondent-father has not, however, submitted any written arguments for our consideration in this case.

This Court independently reviews issues identified by counsel in a no-merit brief filed pursuant to N.C.R. App. P. 3.1(e) for the purpose of determining if any of those issues have potential merit. *In re L.E.M.*, 372 N.C. 396, 402 (2019). After a careful review of the issues identified in the no-merit brief filed by respondent-father's appellate counsel in this case in light of the record and applicable law, we are

---

that neither DSS nor the guardian ad litem have sought to have respondent-father's appeal dismissed.

satisfied that the findings of fact contained in the trial court's termination order have ample record support and that the trial court did not err in the course of determining that respondent-father's parental rights in Jacob were subject to termination and that the termination of respondent-father's parental rights would be in Jacob's best interests. As a result, we affirm the trial court's order terminating respondent-father's parental rights in Jacob.

AFFIRMED.